FILED

JUN 28 2010

Clerk of the Court
Rec'd by_____

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 20, 2010 Session

## JERRY ROBERTSON, A/K/A JERE ROBERTSON v. CLARA ROBERTSON HODGES, ET UX., ET AL.

Direct Appeal from the Chancery Court for Sevier County
No. 05-5-201   Hon. Telford E. Forgety, Jr., Chancellor

---

No. E2009-01335-COA-R3-CV

---

John W. McClarty, J., Dissenting:

I must dissent from the majority's holding that Jerry Robertson's action is barred by judicial estoppel. This court recently engaged in a comprehensive discussion of the doctrine of judicial estoppel in *Gordon ex rel. Gordon v. Draughn*, No. M2008-02224-COA-R10-CV, 2009 WL 1704470 (Tenn. Ct. App. M.S., June 16, 2009):

> The doctrine of judicial estoppel provides that "a party will not be permitted to take a position that is directly contrary to or inconsistent with a position previously taken by the party where the party had or was chargeable with full knowledge of the facts and where the conduct would prejudice another." *Guzman v. Alvares*, 205 S.W.3d 375, 382 (Tenn. 2006) (citing *Marcus v. Marcus*, 993 S.W.2d 596, 602 (Tenn. 1999)). "The term 'judicial estoppel' . . . indicates particularly that class of estoppels arising from sworn statements made in the course of judicial proceedings, generally in a former litigation." *Sartain v. Dixie Coal & Iron Co.*, 266 S.W. 313, 316 (Tenn. 1924).

> The doctrine of judicial estoppel, and an exception thereto, were discussed by the Tennessee Supreme Court in *Sartain v. Dixie Coal & Iron Co.*, 266 S.W. 313 (Tenn. 1924), which held:

>> The Tennessee law of judicial estoppel . . . has nothing to do with other parties to the suit; nor does it matter whether they even knew of the sworn statement. It is . . . based solely upon that public policy which upholds the sanctity of an oath, and

precludes a party who has made a sworn statement -- even in another litigation -- from repudiating the same when he thinks it to his advantage to do so.

\* \* \*

While the appellate courts of Tennessee have . . . upheld and preserved the sanctity of an oath by the application of this principle, yet, in order to avoid injustice, the severity of the rule has been tempered by this exception, viz: **If the party sought to be estopped can show that his previous statement under oath was made inadvertently or through mistake . . . he will not be precluded by his former statement.**

*Id.* at 317-18; *see D.M. Rose & Co. v. Snyder*, 206 S.W.2d 897, 906 (Tenn. 1947) (holding that "[w]hile judicial estoppel applies where there is no explanation of the previous contradictory sworn statement, it does not apply where there is an explanation showing such statement was inadvertent, inconsiderate, mistaken, or anything short of a 'willfully false' statement of fact") (internal citations omitted). "Anything short of 'conscious and deliberate perjury' is insufficient to give rise to the doctrine of judicial estoppel." *Echols v. Echols*, 2007 WL 1756711, at *3 (Tenn. Ct. App. June 19, 2007) (citing *State ex rel. Scott v. Brown*, 937 S.W.2d 934, 936 (Tenn. Ct. App. 1996)). "A trial court's application of the doctrine of judicial estoppel presents a question of law." *Frazier v. Pomeroy*, 2006 WL 3542534, at *10 (Tenn. Ct. App. 2006).

In their motion for summary judgment, Appellees argued that Ms. Gordon was judicially estopped from pursuing the claims alleged in her complaint "because she did not disclose the existence of her medical malpractice/wrongful death claims in her bankruptcy." Specifically, they asserted that, "at the time [Ms. Gordon] filed her voluntary chapter 7 bankruptcy petition, [she] possessed and knew of the medical malpractice/wrongful death claims which she asserts in this action"; that "[d]espite this, she did not list these claims as an asset and the bankruptcy court thereafter granted her a discharge"; and that the present suit was filed "[a] mere six (6) weeks" after her discharge. . . .

\* \* \*

. . . While Ms. Gordon's failure to include the medical malpractice claim in

2

her bankruptcy petition could constitute a basis for applying judicial estoppel, **there is no proof that the omission was "willfully false,"** *D.M. Rose & Co.*, 206 S.W.2d at 906, **or an act of "conscious and deliberate perjury."** *Echols*, 2007 WL 1756711, at *3. **To the contrary, her affidavit stated that, at the time she filed her bankruptcy petition, she did not believe that she had a viable cause of action** and that she did not understand the need to include the medical malpractice claim in the petition. Appellees filed nothing to counter these facts. . . . The record shows that Ms. Gordon did not know she had a viable medical malpractice claim and did not understand the ramifications of omitting the malpractice claim from the bankruptcy petition. . . . Consequently, we reverse the trial court's application of judicial estoppel . . . .

*Gordon*, 2009 WL 1704470, at *5-7 (emphasis added).

The matters at issue in this case arose with the Will of Henry C. Butler, probated in 1936. The relevant devise read as follows:

> I hereby give, devise and bequeath to Til[l]man A. Roberts[on] for and during his natural life with remainder to heirs at Law a tract of land in the fourth civil district of Sevier County, Tenn. on the East Fork of Little Pigeon River, known as the Julie Fox far[m], adjoining said River, my other lands and the lands of Paine and Waters.

Tillman A. Robertson ("Father") and Lona Robertson adopted Jerry Robertson ("Son"), born July 8, 1939, in 1945. Son testified that sometime in 1958, his biological uncle, Ralph Roberts, provided him with a copy of the Butler Will and informed him that he would inherit part of the farm described therein after Father died. Son stated that when he was approximately 18 years old, he took the Will to W. Henry Ogle, an attorney in Sevier County. Mr. Ogle likewise told him that Father only had a life estate in the property and that Son would have an interest in the farm upon Father's death.

Father died on June 10, 1990. Son testified that within a day or two of the funeral, Clara Hodges ("Sister"), Father's biological daughter, told him, "Daddy gave the farm to me." Father's will only left Son $100.

Not long after Father's death, Son went through a divorce and filed for bankruptcy.

3

He testified that he did not list any interest in the property at the time of the divorce and bankruptcy because he did not think he owned it. He explained as follows:

Q  Now, I believe your divorce action was filed in late '92 and your bankruptcy was filed in January of '93; correct?

A  It was in '93 sometime.

Q  Were you short of money?

A  Yes, sir.

Q  Did you need to try to find some assets worth something?

A  Yes, sir.

Q  Did you consider this farm of H.C. Butler and what to do with it?

A  I did.

Q  Now, what did you do to pursue about that. Did you think you ought to have a claim on that farm?

A  After people went bankrupt and didn't pay me, I took H.C. Butler's will to Wanda White, who is an attorney who just got out of law school, and told her that -- showed her the will and I told her that daddy died and

. . .

* * *

A  I told her I had a sister and I told that . . . she lived in the house. And she said when did she move in the house.

* * *

A  . . . I told her Clara moved in the house. She said how soon after your daddy died. And I said immediately. And she said . . . let me research this and I'll get back to you.

So two or three days later as I was walking by, she said come in a minute. So I went in and she said -- she asked me the question how long did your sister live in the house after your daddy died. She said had she lived there over six months. I said yes.

She said well, you don't have anything now because you're supposed to file something within that six month's period. And she said here it is in a law book, and she read it and gave it to me to read, and I thought that was -- I didn't have anything after that for a long time.

4

Q  Now, between 1992 when you talked to this Wanda White and at least 2003-2004, you didn't do anything did you?

A  I didn't do anything because --

Q  Regarding this farm?

A  No, I didn't. She said I didn't have anything.

Q  Well, but then all of a sudden you did something. Now, you're saying all of a sudden and despite her advice to you, now some 13 or 14 years later all of a sudden you're looking into it. . . .

A  Yeah. My son called me and said I needed to check into it. I still didn't think I had anything because she said I didn't have anything.

So he said if you're not going to do anything about it . . . send it to me and I'll get it checked out. . . .

In a 2006 affidavit, Son swore as follows:

8. I was made aware by an uncle in approximately 1958 of the H.C. Butler Will and of the fact that Tillman Robertson only had a life estate in the farm where I was raised and that at his death it would go to his heirs at law, which I understood to be myself and my sister Clara.

* * *

10. I did attend Tillman Robertson's funeral in 1990 and Clara Hodges told me at that time that she was moving back to take care of our mother who still lived there. I made no objection to this occurring.

* * *

20. At all times, I knew that Clara Hodges was a child of Tillman Robertson and that she and I were the only heirs at law of Tillman Robertson and that we were equal owners.

The trial court, after noting that it was uncontested that Son had not disclosed any interest in the farm in the Marriage Dissolution agreement in 1992 and in the Schedule A of the 1993 bankruptcy action, made the following findings:

Now, without question, also, and according to Jerry Robertson himself, he knew in 1958, he knew for sure, having talked to an attorney in 1958, an attorney in Sevier County, Tennessee, Henry Ogle, the father of Rex Henry, our current Circuit Judge, one of our Circuit judges.

Well, he talked to two people. He talked to his uncle, Ralph Roberts, who was a clerk in the county court clerk's office which handled probate at that time and which still handles probate today in Sevier County, and his uncle told him the same thing Henry Ogle told him. Yeah, yeah, at the death of Tillman Robertson you will be an owner of a half interest in the farm.

Two people, a practicing lawyer in Sevier County in 1958, and his uncle, who was a clerk in the probate court office at that time, so he clearly knew, and he admits that he knew in 1958 he had an interest in that farm at the death of Tillman Robertson.

All right, you come down to 1990. Tillman Robertson died and some things happened there . . . . But subsequent to the death of Tillman Robertson Jerry Robertson divorces his wife -- or rather his wife, Vivian, divorces him, but it's all the same. It was an agreed divorce. And he simply did not disclose anything in the marital dissolution agreement about that farm and attempted to make no disposition of any interest that he might have owned in the farm.

And then in 1993 he files a bankruptcy and he swears in his petition under penalty of perjury, as he must when he files a bankruptcy petition, and he attaches all of the schedules to the bankruptcy petition, one of which is, I think it's Schedule A, which is real property -- yeah, Schedule A is Real Property, real property owned and he fills it out none.

His lawyer at that time was David Bohannon. Mr. Bohannon I don't know, but in fact it was his lawyer. His lawyer was not Wanda White. Mr. Robertson attempts to explain away the fact that he made no disclosure in the final decree of divorce -- and by the way, Wanda White was not his lawyer or even his wife's lawyer on the divorce either. That was a gentleman by the name of Chris Cawood.

He attempts to explain away the fact he didn't say anything in his divorce or bankruptcy by saying well, I had talked to this other attorney, this Wanda

White, and she had told me -- he says I think I showed her the Will of H.C. Butler. I did show her the Will of Tillman Robertson and she told me that since my sister had moved onto the property and been there more than six months, that there was a six month time period for making claims on the estate of Tillman Robertson and I had no interest in the land. Quite frankly, I cannot accredit that, I cannot accredit that and don't accredit it and here's why, among other reasons.

Of course, Mr. Robertson had certainly spoken to an attorney in Sevier County in 1958 who had told him he clearly did have an interest in the remainder in the farm. He had spoken to his uncle, who worked in the probate court clerk's office, and he explained to him he had interest in the property.

I cannot accredit Mr. Robertson's testimony to the affect that well, after having been told in 1958 that I had an interest in the property and after having gone all of those years apparently still thinking I had an interest in the property that I talked to this new lawyer, Wanda White, brand new, and I just gave up. I cannot accredit that.

I think, quite frankly, that the doctrine of judicial estoppel applies here, that Mr. Robertson had dealings with his ex-wife, make a marital dissolution agreement on the basis of what was represented to have been full disclosures to her and didn't tell her about this farm, about any claim he had in this farm.

He had dealings with the bankruptcy court and multiple creditors, even the Internal Revenue Service and he didn't tell any of those creditors. He didn't tell the bankruptcy court that he had any claim to this farm. He apparently didn't tell his lawyer in the bankruptcy, David Bohannon, that he had any claim to this farm, because had he told him that, Mr. Bohannon most certainly would have included a half interest in the farm on that Schedule A.

So I think the doctrine of judicial estoppel applies . . . .

The trial court proceeded as follows regarding another ground:

[W]ith that statement, daddy left the farm to me,[1] Clara was wrong about that.

---

[1] At trial, Son testified that when Sister made the statement, he did not know which farm to which she was referring, as the property of Father consisted of more than one farm. He stated, "I thought she was talking about the other farm."

Tillman Robertson didn't leave it to her at all. If it went to her, it went to her because of the Will of H.C. Butler, not because of anything Tillman Robertson did because all he had was a life estate and it died with him, as a life estate must.

Nevertheless, Clara Hodges told Jerry Robertson at Tillman Robertson's funeral or within a day or two one way or the other that daddy left the farm to me. That to the Court clearly put Jerry Robertson on notice as of that time, 1990, that Clara Robertson Hodges thought the farm was hers and that she was claiming it.

She might have been wrong. She might have been wrong in her reasoning as to how she got it and why she got it and so forth, but the Court concludes without much question in the Court's mind that Jerry Robertson knew, and by the way, Jerry Robertson admits that that conversation took place, he admits it, that she told him daddy left the farm to me.

That tells me, if it doesn't tell me anything else, it tells me that Jerry Robertson knew at that moment that Clara Robertson Hodges was claiming the farm. She might have been wrong about it. Like I said, she might have been wrong about the legal reasoning for it, but he knew as of that time that she was claiming the farm.

Now, since 1990 and for 15 years up until the time this lawsuit was filed, Clara Robertson Hodges and her husband have lived on the farm, farmed the farm, worked it every day, improved it, spent many thousands of dollars improving it, they borrowed money on it on several occasions. They sold one tract of 3.535 or 3.553 acres, one or the other, to their son and daughter-in-law, Ray and Voletta Hodges, and then in 1996 executed a ground lease for a portion of the property to another gentleman for the purpose of building a convenience store. . . .

The bottom line, of course, it's clear to the Court that there was in the meaning of the law an actual ouster here of Jerry Robertson, actual notice to him in 1990 that Clara Robertson Hodges was claiming the farm.

By the way, you stop and think about it, . . . **if Jerry Robertson by 1992 and 1993 didn't believe that he owned an interest in the farm, maybe he thought he had been ousted. Maybe he thought he had been ousted. But if he ever had a claim and he certainly knew he did have a claim in 1958,**

8

**so something changed between '58 and '92 or '93. Maybe he thought he had been ousted.**

**Maybe he thought he had lost his -- of course, by 1992 or '93 he would not have lost his claim if it had been good in the first place. . . . <u>I do believe what he says when he says I didn't think I owned any interest in the farm in '92 or '93</u>, because he certainly acted like he didn't own an interest in the farm and he acted like it in his divorce in '92 and he acted like it in his bankruptcy in '93.**

So on that ground as well the Court holds that if Mr. Robertson had owned an interest as a co-tenant that he had been ousted and that the adverse possession statute of limitation has run against him with respect to his claim.

(Emphasis added).

There is a good faith exception to judicial estoppel, *see New Hampshire v. Maine*, 532 U.S. 742, 753, 121 S.Ct. 1808 (2001) ("We do not question that it may be appropriate to resist application of judicial estoppel when a party's prior position was based on inadvertence or mistake." (internal quotation omitted)). Judicial estoppel clearly does not apply where there is an explanation showing that the previous contradictory sworn statement was inadvertent, inconsiderate, mistaken, or anything short of a 'wilfully false' statement of fact. *See Rose v. Snyder*, 206 S.W.2d 897 (Tenn. 1947); *State ex rel. Scott v. Brown*, 937 S.W.2d 934, 936 (Tenn. Ct. App. 1996).

In this case, Son appears to have become confused as to his rights in the property. As noted by Son's attorney, back in 1990, a half interest in the farm property was worth $1,250,000. The total liabilities of Son at the time of the bankruptcy were slightly more than 10% of that amount. If Son had believed at that time that he was a half owner of the farm property, he would have divided it or borrowed against it to avoid the bankruptcy, and still had over a $1,000,000 in assets.

Although the trial court did not accredit Son's reason for not disclosing the property in the divorce and bankruptcy proceedings, the court stated that it did not think Son was intentionally making false statements about his belief that he did not own an interest in the property in 1992 and 1993: "I do believe what he says when he says I didn't think I owned any interest in the farm in '92 or '93 . . . ." Accordingly, because Son did not make a "willfully false" statement or commit "conscious and deliberate perjury," it was error of law to rule that he was barred by judicial estoppel. This appeal should be considered on the other

9

grounds found by the trial court.  It is for these reasons I dissent from the majority holding.


_____
JOHN W. McCLARTY, JUDGE